UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Evan W. Gray

v.                                        Civil No. 18-cv-522-JL
                                          Opinion No. 2023 DNH 001

Chester L. Gray III


**ORDER AFTER BENCH TRIAL:**
**FINDINGS OF FACT AND RULINGS OF LAW**

During their lives, Barbara and Chester Gray accrued a significant amount of wealth,

which they intended to leave to their three sons, Chester L. Gray III ("Skip"), Scott Gray, and

Evan Gray, via two relatively ordinary trusts.[1]  Spurred, however, by the one extraordinary

provision--which carves out a chunk of the brothers' inheritance to maintain Barbara and

Chester's old home and prope35y in Grafton, New Hampshire--the brothers have engaged in a

series of legal fights since Barbara's and Chester's respective deaths in 2013 and 2017.[2]

The present case is just one of these contentious disputes.  In 2018, Evan, who proceeds

pro se,[3] began this case against Skip, his oldest brother and then-executor of their father's estate.

Evan's claims against Skip relate to two trusts created by their parents as vehicles to manage

---

[1]Because the principals in this case all have the same last name, the court uses their first names for clarity, as it did throughout trial.  The court intends no disrespect toward any party. See, e.g., Johnson v. Johnson, 23 F.4th 136, 138 n.1 (1st Cir. 2022) (using first names of members of family with the same last name for clarity); Sacks v. Dissinger, 488 Mass. 780, 782 n.3 (2021) ("Because many parties share a surname, we refer to them all by their first names.").

[2]Many characteristics of the Grays' feud--bombastic, long running, and sometimes petty-- are not unique within the brother-versus-brother canon.  See Beane v. Beane, 856 F. Supp. 2d 280, 284 & n.1 (D.N.H. 2012) (collecting fraternal disputes).

[3]Although Evan proceeds pro se, he is a lawyer and member of the bar in the State of New York.  Prior to trial, Evan recounted his experience practicing law.  Attorney David Eby entered a limited appearance on Evan's behalf for the purpose of presenting Evan's direct examination during trial.

their estates and the brothers' inheritance:  the Barbara J. Gray Revocable Trust of 1996 ("BJG Trust") and the Chester L. Gray, Jr. Revocable Trust of 1996 ("CLG Trust").  Currently, all three brothers are co-trustees of the BJG Trust, but only Skip is trustee of the CLG Trust.

In his two claims that remain in this case,[4] Evan alleges that Skip violated his fiduciary duties as the sole trustee of the CLG Trust and as a co-trustee of the BJG Trust in the year or so following Chester's 2017 death.  Skip, for his part, brought several counterclaims against Evan and their other brother, Scott, including a declaratory judgment counterclaim asking for an interpretation of the terms of the BJG Trust.  In 2020, the court granted summary judgment in Skip's favor on his declaratory judgment counterclaim.  Gray v. Gray, No. 18-522-JL, 2020 WL 4194964 (D.N.H. July 20, 2020).

In June 2022, the court held a four-day bench trial on Evan's remaining claims.  Evan and Skip[5] submitted sets of proposed findings and rulings, and they jointly submitted a statement of agreed-upon facts and a timeline of events.  Having considered the evidence presented at trial and with the assistance of the materials submitted by the parties, the court makes the following findings of fact and rulings of law.  See Federal Rule of Civil Procedure 52(a).

As to Count 3, the court finds that Evan has not proved his claims except as to a $170 payment made from the CLG Trust property for Skip's personal legal expenses.  As to Count 4, the court finds that removal of Skip as co-trustee of the BJG Trust is not warranted.[6]

---

[4]In 2021, the court dismissed Evan's two claims against Chester as moot after a state probate court removed Skip as executor and appointed Evan as his replacement.

[5]Scott Gray is a defendant as to Skip's counterclaims, but he is not as to Counts 3 and 4 of Evan's Amended Complaint.  Accordingly, Scott participated in the trial only as a witness.

[6] The court also denies Evan Gray's motion to strike (doc. no. 234) two purported "statutory affirmative defenses" under RSA 564-B:9-901 and 564-B:9-902 that Evan claims Skip raised at the eleventh hour before trial.  The court denies Evan's motion because Skip's general good faith defense stated in his answer as his Third Defense (doc. no. 15 at 32) encompasses

## I.    Findings of Fact

1.    During trial, Evan, Scott, Skip, and Attorney Nicholas Harvey testified.

2.    In addition, Evan presented the expert testimony of John Lisle, and Skip presented the expert testimony of Attorney Joseph McDonald.  Lisle is a retired trust portfolio manager in Pennsylvania.  Attorney McDonald is an attorney in New Hampshire who specializes in trust and probate law.  Both Lisle and Attorney McDonald have extensive experience as trustees and in managing trust property.

3.    Both Lisle and Attorney McDonald recounted impressive experience in their respective professions, which rendered them qualified to give their opinions about customs and standards in trust property management, but Attorney McDonald's testimony was more persuasive because it was more applicable to the facts of this case.

### A.    Establishment of amended and restated CLG Trust and BJG Trust

4.    Chester L. Gray Jr. and Barbara J. Gray were Skip, Scott, and Evan's parents.[7]

5.    In 1996, Chester and Barbara created the CLG Trust and the BJG Trust.[8]  Chester was the settlor of the CLG Trust.  Barbara was the settlor of the BJG Trust.[9]

---

good faith defenses under RSA 564-B:9-901 and 564-B:9-902.  See Williams v. Ashland Eng'g Co., 45 F.3d 588, 593 (1st Cir. 1995), overruled on other grounds by, Carpenters Local Union No. 26 v. U.S. Fidelity & Guar. Co., 215 F.3d 136 (1st Cir. 2000).  The Third Defense as pleaded put Evan on notice that Skip would be arguing that he is not liable because he acted in good faith.  Furthermore, Evan has not shown that he was prejudiced because Skip did not particularly identify RSA 564-B:9-901 or 564-B:9-902 in his answer.  See Williams, 45 F.3d at 593 ("Where, as here, a plaintiff clearly anticipates that an issue will be litigated, and is not unfairly prejudiced when the defendant actually raises it, a mere failure to plead the defense more particularly will not constitute a waiver.").

[7] Undisputed Facts (doc. no. 214) ¶ 3.
[8] Id. ¶¶ 13-14.
[9] The settlor, in the context of this case, is the person or persons who created the trust. See RSA 564-B:1-103(15).

6.     In 2009, Chester hired Attorney Nicholas Harvey, who was then employed by the law firm Stebbins Bradley, to help him reevaluate their estate planning.

7.     In 2011, aided by Attorney Harvey, Chester and Barbara amended and restated the terms of the CLG Trust and BJG Trust.[10]  The trusts' amended terms are set out in two documents, which in a series of articles enumerate the trusts' purposes, the proper handling of the trusts' property upon Chester's and Barbara's deaths, and the powers and duties of the trustees.

8.     Under the 2011 terms, Chester and Barbara served as the co-trustees of both the CLG Trust and the BJG Trust, which were revocable until their respective settlor's death.  The trusts became irrevocable, and the provisions for trustee succession were triggered, upon their respective settlor's death.[11]

9.     Chester and Barbara created the CLG Trust and BJG Trust, respectively, to aid the management of their property before and after their deaths.[12]

10.     At the time Attorney Harvey drafted the trusts, Chester or Barbara faced a significant estate tax after the first spouse's death.  Accordingly, rather than create one trust into which Chester and Barbara poured all their joint property, Chester and Barbara formed separate trusts and split their otherwise joint property between the trusts to avoid the estate tax.

11.     After Chester and Barbara's deaths and after payment of any obligations, the property of both trusts--with one notable exception--were meant to be distributed in equal parts to Skip, Scott, and Evan.[13]

---

[10] Undisputed Facts ¶¶ 17-26.
[11] Preamble, Arts. 1.4 & 1.5, BJG Trust; Preamble, Arts. 1.4 & 1.5, CLG Trust.
[12] Art. 1.1B, BJG Trust; Art. 1.1B, CLG Trust.
[13] Art. 2.4, BJG Trust; Art. 2.2, CLG Trust.

12.     The property Chester and Barbara held in the trusts included assorted securities, bonds, and cash.  However, Chester also placed into the CLG Trust their home and some surrounding property, located in Grafton and Springfield, New Hampshire (the "Grafton Property").[14]

13.     The Grafton Property consists of a large house and more than 200 acres of land.

14.     From Chester's retirement around 1991 until their respective deaths, Chester and Barbara lived at the Grafton Property.

15.     The Grafton Property, which had been in Barbara's family, was exceptionally important to Chester, and he wanted to maximize the chance that the property would be held by his descendants.

16.     Thus, one purpose of the CLG Trust is to hold and maintain the Grafton Property for Barbara and Chester's descendants "for as long as is reasonably and prudently possible."  To that end, the CLG Trust provides that, after Chester's death, the Grafton Property will be placed in a "Continuing Trust," which shall exist until certain conditions outlined in Article 2.2.A(2)-(4) of the CLG Trust are met.[15]

17.     The CLG Trust provides for a "maintenance fund" as part of the Continuing Trust.  The purpose of the maintenance fund is to aid Skip, who is provided preferential treatment with respect to using the Grafton Property, in managing the Grafton Property after Chester's death. The CLG Trust directs its trustee to endow the maintenance fund with assets valued at $820,000, with an adjustment for inflation, to generate income for the property's maintenance.  The CLG

---

[14] The property is contiguous but crosses portions of both Grafton and Springfield.  For simplicity, the court refers to it as just the "Grafton Property."

[15] Art. 2.2.A(1)-(4), CLG Trust; Gray, 2020 WL 4194964, at *15.  If the Continuing Trust terminates and the Grafton Property is sold, the money from the sale and any remaining assets in the maintenance fund are to be distributed equally among the three brothers.  See Art. 2.2.A(2), (4).

Trust also permits Skip "at his election" to personally pay any of the Grafton Property's costs.[16]

18.     In deciding one of Skip's counterclaims, this court interpreted the CLG Trust to mean that the Continuing Trust and maintenance fund cannot be created "until all death taxes, administrative expenses and other obligations" are paid or provided for.[17]  Only after the Continuing Trust and maintenance fund are created can the trustee distribute the remainder of the CLG Trust's property equally between Skip, Scott, and Evan.[18]

19.     The CLG Trust gives Skip preferential treatment in the use of the Grafton Property and the option to reside at the Grafton Property.[19]  In the CLG Trust instrument, Chester and Barbara explained why Skip was given preferential treatment:

> We understand that holding this land, together with the aforementioned liquid assets held in the maintenance fund, in this trust for an extended period of time may appear to be an inequitable benefit for our son, Skip.  However, he has expressed the greatest interest in continuing to use and enjoy this land and will do so as a steward of the real estate and also for the use of our other sons and their descendants.[20]

20.     The BJG Trust also contains a provision, referred to during this case as a "pour-over provision," related to the Grafton Property and the maintenance fund.  Specifically, BJG Trust Article 2.4.A provides:

> If at the time of the death of my husband and myself, the amount of liquid assets held in the continuing trust for real estate located in Grafton and Springfield, New Hampshire as set forth in my husband's trust is less than [$820,000 adjusted for inflation], I direct that my trustee distribute from my trust an amount of property

---

[16] Art. 2.2.A(1), CLG Trust.
[17] Gray, 2020 WL 4194964, at *15.
[18] Art. 2.2.B, CLG Trust.
[19] Art. 2.2.A(1), CLG Trust.  The trust terms require Skip to "make the property available" to Scott and Evan "for short term periods each year if they want to visit and enjoy the property as well . . . ." Id.
[20] Art. 2.2.A(3), CLG Trust.

that will increase the sums held in said continuing trust of my husband's to [$820,000 adjusted for inflation].[21]

21.    Whether the "amount of liquid assets" in the Continuing Trust is less than $820,000, adjusted for inflation, is determined when the Continuing Trust and maintenance fund are created.[22]

22.    The BJG Trust directs that, after Article 2.4.A is satisfied, its trustees make an equal distribution of its remaining property to Skip, Scott, and Evan.  Once the BJG Trust property is, as necessary, distributed to the maintenance fund and the remainder to Skip, Scott, and Evan, the BJG Trust would effectively cease to exist.[23]

23.    Both trust instruments contain provisions setting out certain powers of trustees—and limiting their liability for violations of fiduciary duties.  Specifically, Articles 4.3 of both the BJG Trust and the CLG Trust state:

> The trustee shall be entitled to use the trustee's best judgment in exercising the powers and rights conferred by this trust and in fulfilling the trustee's obligations under the trust and those imposed by law; the trustee shall not be liable for any action taken or omitted in good faith pursuant to such provisions.

**B.    Barbara Gray's mental state when executing the BJG Trust documents**

24.    During trial Evan testified to his belief that, when the trusts were amended or restated by Barbara and Chester in 2011, Barbara lacked the mental capacity to engage with a complex matter such as a trust document.  Evan's belief about Barbara's mental capacity was based on his observation in November and December 2010 that Barbara, who had been an avid reader and never watched television before, had stopped reading and only watched television.

---

[21] Art. 2.4.A, BJG Trust.  The BJG Trust directs the inflation adjustment to be calculated "in accordance with the percentage changes in the Consumer Price Index – All Urban Consumers (Northeast Region) from January 1, 2011 until January of the year of my death . . . ."  Id.

[22] Gray, 2020 WL 4194964, at *15.

[23] See Arts. 2.4.B & 3.7 ("Termination of Small Trusts"), BJG Trust.

25.     Attorney Harvey met with Barbara in February 2011 when she and Chester executed the trust restatements.  Attorney Harvey explained the trusts' terms, including the pour-over provision, to Barbara.  Attorney Harvey "talked at some length" with both Chester and Barbara about the Continuing Trust "to confirm that's what both of them wanted."  Attorney Harvey wanted to confirm at the meeting that the Continuing Trust also reflected Barbara's wishes because he had not yet met Barbara in person.  Attorney Harvey testified that Barbara "seemed very happy with it" and that he was satisfied with Barbara's apparent understanding of the trusts' terms.

26.     Barbara Gray was competent to restate her trust in 2011, which resulted in the BJG Trust.

### C.     Chester's and Barbara's Deaths

27.     During their lifetimes, Chester and Barbara were co-trustees of both trusts.  The trusts set out trustee succession plans upon the deaths of one or both of Chester and Barbara.[24]

28.     Barbara died on April 9, 2013.[25]

29.     Per the trusts' succession plans, Chester became sole trustee of both trusts after Barbara's death.[26]

30.     Chester died on April 26, 2017.[27]

31.     Consistent with the BJG Trust's succession plan, Skip, Scott, and Evan became co-trustees of the BJG Trust.[28]  Likewise, Skip accepted the role of sole trustee of the CLG

---

[24] Art. 1.4, BJG Trust; Art. 1.4, CLG Trust.
[25] Undisputed Facts ¶ 27.
[26] Id. ¶ 28.
[27] Id. ¶ 36.
[28] Art. 1.4, BJG Trust; see Evan Gray Proposed Rulings of Law (doc. no. 229) ¶ 96.

Trust.[29]  Skip was also appointed executor of Chester's estate.[30]

32.    Evan contends that Skip did not tell him that he had accepted the role of trustee of the CLG Trust.

33.    When Chester died, the BJG Trust held property valued just under $1.5 million.[31]  The CLG Trust's investment assets were valued at more than $1.5 million, and the CLG Trust also held the Grafton Property.[32]  At the time Chester died, the CLG Trust investments were projected to produce $63,792 in income per year.[33]

### D.    Family Relationships

34.    Evan is a lawyer who practices law in New York City.  Skip is a pastor and book seller in Massachusetts.  Scott lives in Florida, and he is a consultant who provides financial analysis related to litigation.

35.    For a time as a young adult, Skip had a difficult relationship with his parents.  As Skip grew older, however, his relationship with his parents improved, and Skip then maintained a good relationship with both of his parents through their deaths.

36.    Growing up, Skip did not have a close relationship with Scott and Evan because of the difference in age among them.  As adults, the three brothers never lived near each other, but they gathered for holidays--usually at the Grafton Property with their parents.

---

[29] Undisputed Facts ¶ 40.  It is common for parents to name one child as a trustee of a trust when that child and others are beneficiaries.

[30] See id. ¶ 45.  In May 2021, a probate court removed Chester as executor and appointed Evan Gray in his place.

[31] Id. ¶ 37.

[32] Id. ¶ 38.

[33] Id. ¶ 39.

37.     Evan testified that he had been "subjected to malicious and sadistic mistreatment by" Skip since Evan was a young child.  Evan did not elaborate in his testimony on what specific treatment by Skip during their childhood was "malicious and sadistic."

38.     Evan had assumed that he would be executor of Chester's estate.[34]  Evan also believes that Barbara would have named him sole trustee of the BJG Trust, but Skip and Chester conspired to influence Barbara to name Skip and Scott as co-trustees.

39.     Evan disagrees with Chester's attempt to keep the Grafton Property in the family and with his decision to create the maintenance fund.  Evan also disagrees with Skip's intent to exercise his right under the CLG Trust to use the maintenance fund to maintain the property and believes Skip should use his own money for that purpose.

40.     This case is just one of Evan's suits over the brothers' inheritance.  Other suits continue in state court.

**E.     Initial Difficulties Administering the Trusts and Estate**

41.     The jobs of executor and trustee proved difficult for Skip.  At the time Chester died, Skip "barely had any idea what a trust was" and "had very little understanding of the estate."  Skip was also confused about the nature of the two trusts, believing at first that that the BJG Trust and CLG Trust "were one account in essence."

42.     Skip understood that he lacked experience or knowledge in trust management.  He hired Stebbins Bradley, the law firm that had prepared the trusts, to assist him with legal issues, and he spoke with an account manager at Merrill Lynch to help him with financial issues.  Skip also hired an accountant to help with taxes for the estate and the trust.  These advisors helped Skip,

---

[34] Evan is disappointed that Skip did not ask for his help in managing the trust.

and over time he learned, at least in general terms, what the jobs of trustee and executor required of him.

43.     In the years prior to his death, Chester neglected the Grafton Property and his affairs. After Chester died, it was difficult for Skip to manage the Grafton Property.  The size of the property--exceeding 200 acres--meant it required frequent outdoor maintenance, while the interior of the home was in disarray and important paperwork and personal property were scattered throughout the house.  The neglect and disarray made putting together an inventory of assets and tracking down necessary paperwork difficult for Skip.

44.     Skip spent a significant amount of time in the months following Chester's death finding the paperwork and determining the needs for the Grafton Property.  Skip did not always act as quickly as Evan wanted, and he had trouble keeping up with his responsibilities.  Skip's record keeping was inconsistent, though it improved as he gained more experience.

45.     In the months following Chester's death, Skip focused on his role as executor of Chester's estate and on the Grafton Property.  Skip did not focus--contrary to Evan's wishes--on the other property held in the CLG Trust.

46.     Early on in the process, Skip and Evan were able to work together on some issues and agreed to distribute property--separate from that involved in the trusts in this case--from Chester's retirement account.  The brothers received a substantial amount of money from that distribution.

47.     Despite this brief cooperation, Skip and Evan's relationship was usually hostile.

48.     After Skip became trustee of the CLG Trust and executor of Chester's estate, Evan frequently demanded information from Skip that Skip either did not have or did not fully understand how to obtain.  Evan displayed impatience with his brother in his quests for

information, and Skip's different priorities frustrated Evan.  Evan's priorities likewise puzzled

Skip.

49.     Evan does not trust Skip.  For example, Evan testified that he received a letter from

Skip's law firm on his birthday.  Evan believes that Skip told his lawyers to deliver the letter on

Evan's birthday just to annoy him.  And when asked at trial to acknowledge that Skip is a pastor,

Evan sardonically responded, "He professes to be."  It is unclear whether Evan believes Skip has

done anything correctly as a trustee.

50.     In turn, Skip has an uncomplimentary view of Evan.  Skip implied during his testimony

that Evan drinks too much and has an anger problem.

51.     Evan's correspondence with Skip and those working with Skip was unpleasant and

unnecessarily sharp and accusatory.[35]

52.     An early flashpoint for Evan involved Skip's then-counsel's initial miscalculation of the

inflation adjustment for the maintenance fund.  Though seemingly trivial to resolve, the inflation

adjustment issue escalated as Evan and Skip's counsel traded snide letters. [36]

53.     On December 12, 2017--before the maintenance fund was created and the remainder of

either trust distributed--Evan notified Skip by letter that he was asserting claims that Chester

---

[35] See, e.g., Pl. Exh. 31 (May 23, 2017 email responding to Stebbins Bradley paralegal that raises numerous issues and previews future complaints about legal expenses); Pl. Exh. 40 (July 28, 2017 letter accusing Skip of failing to act with impartiality and stating that Skip had conflicts of interest and raising numerous issues to Skip's legal counsel); Pl. Exh. 55 (December 5 and 7, 2017 emails from Evan to Skip accusing Skip of misconduct).

[36] Skip initially retained the law firm Stebbins Bradley to aid him with the trust administration, and it was a lawyer from Stebbins Bradley who made the initial miscalculation of the inflation adjustment.  At some point after the initial miscalculation, Skip switched to the law firm McLane Middleton because of "the sort of legal tone of Evan's communications" about the inflation adjustment and Skip wanted to have counsel "that was ready and willing and able to deal with litigation."  McLane Middleton represented Skip in this lawsuit until December 2021. The law firm Shaheen & Gordon represented Skip through trial.

violated his fiduciary duties when he was trustee of the BJG Trust and CLG Trust.  Evan

demanded payment of at least $850,000 from Chester's estate and the CLG Trust[37] in favor of

the BJG Trust. [38]

54.     Scott delegated his authority as co-trustee to Evan with respect to Evan's claims.  Scott

did not "know the merits or the non-merits" of the claims.  Since that time, Scott has "shut [the

case] out" and has not "paid much attention to it."  Scott wants to avoid taking sides between

Skip and Evan, but continues to authorize this suit to move forward in his capacity as trustee of

the BJG Trust.

55.     Evan believes that the maintenance fund should bear the entire cost of attorney fees

resulting from his December 12 letter because protecting the maintenance fund was the only

reason to defend against the claims.  Evan testified that he did not expect Skip to be "foolish

enough to waste money" defending against the claims and that it did not make sense for Skip to

spend money defending the claims when Skip could instead pay "some amount of money" to the

BJG Trust.  Evan testified that he expected the December 12 letter to bring Skip "to his senses"

and settle the claims.

56.     Evan, however, denies that he engineered this lawsuit to undermine the maintenance fund

or cause it not to be implemented; rather, Evan testified, he brought the lawsuit because Skip

refused to negotiate a settlement.  Evan testified that he would have negotiated a settlement for

an amount that did not impact the maintenance fund.  Evan believes that such a settlement never

---

[37] Under RSA 564-B:5-505(b)(1), the property of a trust that was revocable at the time of
its settlor's death is liable for debts of the settlor's probate estate that the estate cannot afford to
pay.

[38] Pl. Exh. 56.

came to fruition because Skip's prior counsel, Attorney Ralph Holmes of McLane Middleton, "wanted to earn as many fees as possible."

57.     Skip would have preferred to settle the suit, "as long as the trust could remain as described in" the CLG Trust instrument.

58.     Evan filed this suit on June 13, 2018.  Counts 1 and 2 related to Chester's conduct as trustee prior to his death.  Evan later amended his complaint to add Counts 3 and 4 against Skip based on his conduct as trustee after Chester's death.  Of Evan's claims, only Counts 3 and 4 remain for adjudication.

**F.     Count 3: Skip's conduct as trustee of the CLG Trust.**

59.     In Count 3, Evan alleges that Skip breached his fiduciary duties as trustee of the CLG Trust.  This claim focuses on (1) Skip's management of the CLG Trust property; (2) Skip's supply of reports and accountings about the CLG Trust's property; and (3) Skip's payment of legal expenses from the CLG Trust property.

**1.     Skip's sale of CLG Trust investments in November 2017 and reinvestment in April 2018.**

60.     When Chester died in April 2017, the CLG Trust's property was mostly invested in New Hampshire municipal bonds and a handful of equities, including utilities, AT&T, Verizon, and Exxon.

61.     After he became trustee, Skip did not develop or formulate a written investment plan for the CLG Trust property.  No one advised Skip that he was required to write a written investment plan for the CLG Trust property.

62.     In early November 2017, Skip sold the CLG Trust's equity and bond investments.  The sale incurred expenses of $7,898.60, which Skip paid from the CLG Trust property.

63.     Skip did not tell Evan or Scott about his plan or decision to sell the CLG Trust investments.  The First Annual Account provided by Skip to Evan in September 2018 documents the transactions themselves,[39] but Skip did not document the reasons for them.

64.     Prior to the sale, Skip consulted with an account manager with Merrill Lynch who had also advised Chester on managing his assets.  Skip relied on the account manager's guidance in liquidating the CLG Trust investments.

65.     The proceeds from the sale were held in cash in a bank account generating a small amount of interest income.  The CLG Trust lost income in the form of dividends and bond coupon payments, as well as possible capital gains from growth in the investments' values.  At the same time, the sale minimized the CLG Trust's exposure to market and other risks.

66.     When he sold the CLG Trust's investments, Skip believed that he and Evan were close to resolving their dispute about the maintenance fund's inflation adjustment.

67.     Skip sold the investments because he intended to create the maintenance fund and distribute the remainder of the assets to the three other beneficiaries (himself, Scott, and Evan) as dictated by the CLG Trust terms.

68.     Skip's sale of the equities frustrated Evan.  Evan wanted Skip to negotiate with him about distributing the Verizon stock to him because Evan wanted to take advantage of the cost-basis step up that occurred when Chester died.  Evan was also concerned that Skip would distribute municipal bonds to him.  Evan believes that Skip sold the investments not because he intended to

---

[39] Pl. Exh. 90 (First Annual Accounting).

distribute the funds per the CLG Trust's terms but because he thought it would make Evan upset.

69.     The trust--and therefore Evan as beneficiary--received the advantage of the cost-basis

step up (effectively, a smaller capital gains tax) when Skip sold the Verizon stock.

70.     After the sale of the CLG Trust's investments, the CLG Trust no longer held any

municipal bonds.  After the bonds were sold, Skip could not distribute them to Evan against his

wishes.

71.     As noted, on December 12, 2017, Evan sent Skip a letter demanding payment of at least

$850,000 from Chester's estate or the CLG Trust.  Evan's December 12 letter also demanded

that Skip not create the Continuing Trust or maintenance fund.  Considering Evan's letter, Skip

concluded that he could not distribute the CLG Trust remainder until Evan's claims were

resolved.

72.     Several months later, in April 2018, Skip reinvested some of the CLG Trust's cash,

leaving uninvested an amount sufficient to cover "ongoing expenses" for the trust and Evan's

demand if he were to prevail in his claims or to cover a settlement.

73.     Specifically, after meeting with a Merrill Lynch account manager, Skip purchased four

mutual funds for the CLG Trust account.  Skip selected investments that were portrayed to him

by the account manager as "medium risk and reward."  The purchase incurred commissions and

trading fees of $22,558.28.

74.     Although Skip could have selected funds without upfront fees, those funds had higher

annual expenses.  Skip chose to buy the funds with upfront fees because he planned to hold the

funds for a long period of time as part of the maintenance fund for the Grafton Property.  Skip

concluded that, if the funds were held for longer than six or seven years, the trust would ultimately save money on fees.

75.      John Lisle testified that he believed it was unreasonable for Skip to incur the transaction costs associated with the November 2017 sale and subsequent April 2018 reinvestment.  He attested that the sale and later repurchase of assets made no sense to him, assuming that those assets were intended to be used to support the maintenance fund over a long period of time.  He also testified that he disagreed with Skip's investment choices and testified that he would have invested in lower-cost index funds instead of mutual funds with upfront fees.

76.      Lisle, however, did not know that, in November 2017, Skip was preparing to set up the maintenance fund and distribute the remainder to Skip, Scott, and Evan.  Lisle agreed that it did not make sense to invest in equities when a trust has short-term obligations.

77.      Lisle also did not consider the December 2017 notice of claims when he was preparing his opinion, and he did not consider the potential that the CLG Trust would have to pay a large portion of money to the BJG Trust.

78.      Lisle did not know that a Merrill Lynch account manager presented Skip with several different options with different anticipated risks and returns for the April 2018 reinvestment.

79.      It is typical for a trustee in New Hampshire to distribute trust property to remainder beneficiaries in cash.  A trustee can distribute invested property to a beneficiary if the beneficiary prefers it and there is no potential for dissension or potential liability to the trustee.

80.      During a formerly revocable trust's wind-up period--i.e., the several months after the trust becomes irrevocable upon the settlor's death but before the trust is dissolved or its assets are

distributed--investment in potentially volatile equities is disfavored.

81.     A written investment plan is a best practice for trustees.

82.     The distribution of the CLG Trust funds to the Continuing Trust/maintenance fund and then of the remainder to Skip, Scott, and Evan has not occurred.  The payment of attorney fees defending Evan's lawsuits has substantially reduced the CLG Trust's property.

### 2.     Evan's request for a vacancy report and annual accounting of the CLG Trust.

83.     Soon after Skip became trustee of the CLG Trust, Evan demanded that Skip provide two reports under the CLG Trust terms and RSA 564-B:8-813(d), namely, an "annual accounting" of the CLG Trust property and a "vacancy report" with largely the same information.

84.     A trustee in New Hampshire typically keeps beneficiaries reasonably informed through accountings of trust property, identifying the trustee and the trustee's address.

85.     Skip sent "preliminary information" about the trust property to Evan on May 23, 2017, about a month after Skip became trustee of the CLG Trust.  The information included the combined values of the CLG Trust and BJG Trust.[40]

86.     On June 7, 2018, Skip sent a vacancy report to Evan.[41]  The vacancy report covered the period between April 27, 2017, until May 17, 2017.

---

[40] In providing the information about the CLG Trust property, Skip incorrectly combined the values of both the CLG Trust and BJG Trust.  Evan knew immediately that Skip had mistakenly combined the property values.

[41] Pl. Exh. 79 (Evan June 26, 2018 letter to McLane Middleton responding to Vacancy Report).

87.     Skip provided an "annual account" to Evan on September 11, 2018.  The annual account

detailed the trust property between May 18, 2017, and May 17, 2018.[42]

88.     Also on September 11, 2018, Skip provided Evan an amended vacancy report, which

covered the time between April 27, 2017, and May 17, 2017.[43]

89.     The vacancy report and annual account contain a report of the trust property and assets,

its receipts, and its disbursements.

90.     A law firm, McLane Middleton, prepared the annual accounting and vacancy reports

based on data provided by Skip.

91.     After Skip provided Evan with the accounting and report, Evan communicated various

objections to Skip.

92.     The First Annual Accounting, Schedule B, contains a misstatement of the cost basis for

certain municipal bonds that had been owned by the trust and liquidated in November 2017.

93.     Evan does not claim or submit any evidence that he suffered any damages because of the

alleged inaccuracies in the accounting and vacancy report or as a result of any delay in receiving

them.


**3.      Skip's payment of certain legal expenses from CLG Trust property.**

94.     Evan contends that Skip paid some expenses for legal advice for himself in his personal

capacity and for Chester's estate out of the CLG Trust property.  In developing this allegation,

Evan relied on the descriptions contained in the invoices provided by Skip's law firm.  Evan

marked those expenses which he believed should not have been charged to the CLG Trust.  Evan

---

[42] Pl. Exh. 90 (First Annual Accounting); Def. Exh. X (First Annual Accounting).
[43] Def. Exh. Z (Amended Vacancy Report).

agreed that he did not know for sure whether the advice did not pertain to the CLG Trust.

95.     Skip paid a $170 legal expense for personal services from the CLG Trust account.[44]  This expense was incurred on October 3, 2017, and McLane Middleton's invoice describes it as follows:

> Telephone conference with Attorney Salek regarding representing Mr. Gray individually in the Chester Gray Estate and Trust administration matter; Scan Trust and beneficiaries' names and addresses to Attorney Salek for conflict check; Review results of conflict check.[45]

**G.     Count 4: Skip's conduct as co-trustee of the BJG Trust.**

96.     In Count 4 of his Amended Complaint, Evan seeks removal of Skip as co-trustee of the BJG Trust.  Evan asserts that Skip is disqualified from being a trustee due to inherent conflicts of interest; that Skip has committed serious breaches of trust; and that Skip's failure to cooperate with Evan and Scott substantially impairs the administration of the trust.

97.     Evan thought that Skip was attempting to take control of the BJG Trust in addition to the CLG Trust and Chester's estate.  Evan premised this theory on a letter he received from a paralegal at Stebbins Bradley informing Evan that "a substantial interim distribution"[46] of the BJG Trust funds could be made to the three brothers if Evan executed a "trustee certification form" from Merrill Lynch.  Evan believed that the trustee certification form would give Skip unilateral control over the BJG Trust property because of a provision allowing Merrill Lynch to rely on the instructions of a single trustee.

---

[44] See Pl. Exh. 110 (indicating payment for McLane Middleton October invoice with a trust check).

[45] Pl. Exh. 101 at 5 (Evan summary of Skip's legal expenses).

[46] Evan also believed that a complete distribution of the BJG Trust property should have occurred rather than a "substantial interim distribution."

98.     Evan declined to sign the trustee certification form, and he also refused to assent to Merrill Lynch's "relationship agreement."  Evan, whose legal practice is arbitration, testified that he refused because he disagreed with certain terms in the agreement about arbitration.  Evan also took issue with language about the scope of the agreement.

99.     In 2018, Evan attempted to negotiate the agreements with Merrill Lynch, but Merrill Lynch declined to do so.[47]

100.    Evan testified to his belief that Skip and Skip's then-lawyers at McLane Middleton influenced Merrill Lynch not to negotiate its terms or accept a substitute trustee certification provided by Evan.  Evan premised this belief on the fact that McLane Middleton and Merrill Lynch had offices in the same building.

101.    In November 2017, Evan and Scott Gray agreed to distribute the BJG Trust property before the end of 2017.  Evan asserted that their goal was to wind up the BJG Trust so that it did not have to file a tax return for the next year.

102.    To accomplish a distribution while not assenting to Merrill Lynch's relationship agreement or using Merrill Lynch's trustee certification form, Evan drafted a letter that he proposed to send to Merrill Lynch.  The letter--a copy of which Evan intended each brother to sign and send to Merrill Lynch--instructed Merrill Lynch to distribute the BJG Trust property.  Evan believed that Merrill Lynch would follow the brothers' unanimous instructions notwithstanding his refusal to agree to Merrill Lynch's terms for using their service.

103.    Evan sent Skip the draft letter and asked him to send it to Merrill Lynch.  Two days later, Skip responded and told Evan that he agreed to send the letter.  Evan and Scott signed their

---

[47] See Pl. Exh. 81 (August 7, 2018 letter from Merrill Lynch to Evan).  Merrill Lynch asked Evan and Scott to take their business elsewhere, and "[a]s a gesture of goodwill" agreed to waive a $95 transfer fee if Merrill Lynch received instructions to transfer by August 31, 2018.

letters and sent them to Merrill Lynch. [48]

104.    Skip, however, did not immediately sign and send his letter.

105.    On December 4, 2017, Evan asked Skip whether he had sent the letter, and Skip

responded that he had not.  Skip stated in his email he was "checking with [his] tax accountant"

and asked Evan whether Merrill Lynch had agreed to process the transaction.  Evan expressed

significant frustration and asked Skip to elaborate about why he was checking with a tax

accountant.  Skip explained that he was concerned that the BJG Trust would need to pay its 2017

taxes before distributing all of its property.[49]  Evan responded with a long letter accusing Skip

and Skip's counsel of misconduct.[50]

106.    On December 13, Skip mailed the letter to Merrill Lynch containing the joint instructions

for distributing the BJG Trust.

107.    After Skip mailed the letter, Skip received Evan's notice of claims against the CLG

Trust.[51]

108.    On December 15, Evan received an email from the BJG Trust's account manager stating

that Merrill Lynch would not accept the trust certification form sent by Evan.  The account

---

[48] Undisputed Facts ¶¶ 49-52; Pl. Exh. 53.

[49] Pl. Exhs. 53 (December 4 email asking Skip whether he sent the letter), 54 (Skip December 5 response stating that he had not sent the letter, was "checking with" his "tax accountant," and asking whether Merrill Lynch had agreed to process the transaction).

[50] See Pl. Exh. 55 ("It is now completely evident that your prior message . . . was a complete pretext prepared for you by one of your team of expensive lawyers, just as is the case with this current message. . . . Send the letter to Merrill Lynch, or state that your [sic] are breaching your commitment to do so . . . .  Also, identify to us which lawyer(s) is (are) providing you with advice as to your position as trustee of Mom's trust, as well as who is ghostwriting your e-mails for you, in order that the co-trustees can evaluate the conflicts of interest this creates . . . .").

[51] See Pl. Exh. 56 (December 12 notice of claims).

manager told Evan that Merrill Lynch would only accept its own trust certification forms.  The account manager told Evan that there were, therefore, three options: (1) completing Merrill Lynch's form "so we can proceed with the distribution"; (2) "If the form is not completed the account becomes in effect frozen"; or (3) transfer the account to another firm.  Evan replied, stating that "it seems to me" that the account was frozen because Skip had failed to send the joint instructions to distribute the BJG Trust's property.[52]

109.    On December 19, the BJG Trust's Merrill Lynch account manager replied to Evan, stating that Merrill Lynch "in effect" froze the BJG Trust account because Merrill Lynch had not received its trust certification forms.[53]  Evan did not tell Skip about this correspondence with Merrill Lynch.

110.    On January 4, 2018, Skip wrote another letter to Merrill Lynch rescinding the instructions to distribute the BJG Trust property.[54]

111.    Skip rescinded the letter because he was concerned that Evan's claims against the CLG Trust might cause the maintenance fund to become underfunded, necessitating a pour over of funds from the BJG Trust.  In Skip's view, if the BJG Trust property were distributed and if Evan prevailed in his claims against the CLG Trust, the BJG Trust would not have funds to pour over to the maintenance fund.

112.    Skip did not personally tell Evan or Scott that he had sent a letter to Merrill Lynch informing Merrill Lynch that he did not acquiesce to distributing the BJG Trust property.

---

[52] Pl. Exh. 142 (December 15 through 19 email correspondence between Evan and Merrill Lynch).

[53] Id.

[54] Pl. Exh. 60 (January 14, 2018 letter from Skip to MacGill).

113.    On January 5, 2018--the day after Skip rescinded his instructions to distribute the BJG

Trust property--Skip's counsel sent a letter to Evan and Scott asserting that, if Evan were to

pursue his claims outlined in the December 12 letter in court, Chester's estate would seek

indemnification from the BJG Trust for all defense costs.  This letter further told Evan and Scott

that the CLG Trust may have to be reimbursed under Article 2.4.A, the BJG Trust's pour-over

provision.  Given those potential claims against the BJG Trust's property, Skip asked the BJG

Trust trustees to "refrain from making any beneficial distributions until the issues raised" by

Evan's claims were "resolved."[55]

114.    Neither Evan nor Scott rescinded their letters to Merrill Lynch requesting that a

beneficial distribution be made to them after receiving Skip's January 5 letter.

115.    On April 9, 2018, Skip filed a tax return for the BJG Trust for the 2017 tax year.  Skip

hired an accountant to help with the tax return.  Skip did not tell Evan or Scott that he was

planning to file the tax return or hire the accountant, and Skip did not obtain unanimous or

majority assent to hire the accountant or file the tax return.  Skip paid the accountant and the tax

bill ($1,519) from Chester's estate.  Skip later reimbursed the estate for the tax bill from his

personal account and has paid other tax amounts for the BJG Trust from his personal account.

116.    Skip believed that Scott and Evan had access to all information about the BJG Trust from

Merrill Lynch.

117.    Currently, the BJG Trust property is primarily cash and earns a small amount from bank

interest.  It is undisputed that the BJG Trust property would likely earn more if it were invested.

---

[55] Pl. Exh. 61 (January 5, 2018 letter from McLane Middleton to Evan and Scott).

## II.    Rulings of law

118.    As noted, only Counts 3 and 4 of Evan's Amended Complaint are before the court.  In Count 3, Evan alleges that Skip violated his fiduciary duties to appropriately manage and invest the CLG Trust property and his duty to report to beneficiaries.  Evan also contends that Skip misappropriated CLG Trust property to pay a personal legal expense and legal expenses for Chester's estate.  Evan seeks damages of about $115,000, to be paid by Skip into the CLG Trust account, for losses incurred during Skip's November 2017 and April 2018 transactions with the CLG Trust property.  Evan also seeks an order requiring Skip to reimburse the CLG Trust account for legal expenses paid from the CLG Trust property that were not related to the CLG Trust.  Evan does not identify any damages resulting from the failure to report to beneficiaries.

119.    In Count 4, Evan seeks Skip's removal as co-trustee of the BJG Trust.  Evan asserts that Skip has a fundamental conflict of interest as co-trustee of the BJG Trust and has failed to communicate with his co-trustees.

120.    In defense, Skip argues that his conduct should be measured against a standard of good faith.  Skip asserts that he complied with his fiduciary duties under the law and as set out in the trust instruments and that he acted in good faith at all times.  Skip acknowledges that his trust administration has been imperfect, but he asserts that the mistakes he has made were minor and ultimately inconsequential.

### A.    General Law on Trust Fiduciary Duties and Good Faith

121.    A person who accepts the position of trustee has assorted responsibilities—known as fiduciary duties—to the trust property and trust beneficiaries.  See RSA 564-B:1-105;

Restatement (Third) of Trusts § 3 (2003).[56]  The New Hampshire Trust Code sets the default scope of these duties, which include the duty to prudently administer, invest, and mange trust property, the duty of loyalty, and the duty of impartiality, among others.  See RSA 564-B:1-105(a).

122.    The trust settlor's intent, as evidenced by the trust instrument, can modify, expand, restrict, or waive many of those duties.  Id. ("Except as otherwise provided in the terms of the trust, this chapter governs the duties and powers of a trustee . . . ."); see RSA 564-B:1-112(b)-(c) ("For the purposes of determining the benefit of the beneficiaries, the settlor's intent as expressed in the terms of the trust shall be paramount."); Bartlett v. Dumaine, 128 N.H. 497, 504 (1986) ("In determining the settlor's intent, courts should look to the terms of the trust.").  Accordingly, the court looks to both the law and the trust terms to determine the duties of a trustee.

123.    Regardless of the trust terms, the trustee must always "act in good faith and in accordance with the terms of the trust, the purposes of the trust, and the interests of the beneficiaries."  RSA 564-B:1-105(b)(2).

124.    With respect to a trustee, "good faith" means:

> [T]he observance of common standards of honesty, decency, fairness, and reasonableness in accordance with the terms of the trust, the trust's purposes, and the interests of the beneficiaries as their interests are defined under the terms of the trust[.]

RSA 564-B:1-103(30)(A).

125.    The "interests of the beneficiaries" means "the beneficial interests provided in the terms of the trust."  RSA 564-B:1-103(7).  Thus, the beneficiaries' interests "are defined under the

---

[56] The New Hampshire Supreme Court frequently looks to the Restatement (Third) and Restatement (Second) of Trusts to aid its interpretation of the New Hampshire Trust Code.  See, e.g., In re Omega Trust, 175 N.H. 179, 184-85 (2022) (looking to Restatement for "guidance"); Shelton v. Tamposi, 164 N.H. 490, 500 (2013).

terms of the trust."  See RSA 564-B:1-105(b)(3); cf. RSA 564-B:1-112(c) ("For the purposes of determining the benefit of the beneficiaries, the settlor's intent as expressed in the terms of the trust shall be paramount.").

### B.   Count 3: Skip's conduct as trustee of the CLG Trust

126.   In Count 3, Evan asserts that Skip: (1) failed to appropriately manage the assets of the CLG Trust, resulting in unnecessary losses and missed profit opportunities (2) failed to provide an appropriate and timely accounting to the trust's beneficiaries and failed to properly communicate with the trust's beneficiaries; and (3) improperly paid legal bills from the CLG Trust account.[57]

127.   Skip responds that, considering the circumstances of the transactions, he acted appropriately in selling and then partially reinvesting the trust property.  Skip contends that he provided an accurate accounting and that he has no duty to account to the trust beneficiaries each transaction he makes as trustee.  Skip further contends that because he acted in good faith at all times, Article 4.3 of the CLG Trust exculpates him from any liability.

128.   With one limited exception discussed below, Evan did not prove by a preponderance of the evidence that Skip violated any fiduciary duties while acting as trustee of the CLG Trust during the time period at issue.  Further, as to most of Evan's allegations, Skip proved by a preponderance of the evidence that he acted in "good faith."  Therefore, under CLG Trust and BJG Trust Article 4.3, Skip "shall not be liable" for those actions he took or omitted pursuant to the law or the trust terms.

---

[57] Evan Gray Proposed Rulings of Law ¶¶ 14, 17-18, 22, 32, 36, 40-41, 46-48, 50, 52, and 66.

**1.      Sale of CLG Trust investments in November 2017, April 2018 reinvestment, written investment plan, and choice of investments.**

129.    The New Hampshire Trust Code's prudent investor rule requires a trustee to "invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust." RSA 564-B:9-902(a).

130.    The "circumstances" that a trustee must consider when investing and managing trust property include, among others, "general economic conditions," potential tax consequences of investment decisions, expected returns, "needs for liquidity, regularity of income, and preservation or appreciation of capital," and "an asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries." RSA 564-B:9-902(c); see Restatement (Third) of Trusts § 90(b) (2003) ("In making and implementing investment decisions, the trustee has a duty to diversify the investments of the trust unless, under the circumstances, it is prudent not to do so.").

131.    The test of prudent management "is one of conduct not of performance.  The trustee's conduct, and compliance with other fiduciary standards, is to be judged as of the time of the decision or action in question."  Restatement (Third) of Trusts § 77 cmt. a (2003); accord RSA 564-B:9-905(a)(1) (amended 2014).

132.    The CLG Trust grants the trustee "all powers granted by law" and, in addition, provides enumerated "discretionary powers with respect to both real and personal property held in trust."[58] These discretionary powers include the power to "invest and reinvest in any bonds, stocks, mutual funds, . . . and securities of any type or form and other property of any kind, real or

---

[58] Art. 4.11, CLG Trust.

personal, irrespective of any statute or rule of any state or other jurisdiction limiting the investment of fiduciary funds."[59]

133.    The CLG Trust modifies the prudent investor rule by stating that the trustee is entitled to use his "best judgment" in fulfilling his obligations.  And, as noted, Article 4.3 states that the "trustee shall not be liable for any action taken or omitted in good faith" pursuant to the law or trust terms.[60]

134.    Skip's November 2017 sale of the CLG Trust property was prudent under the circumstances at the time.  At the time, Skip reasonably believed that soon he would be distributing the CLG Trust's property to its four beneficiaries--approximately $820,000 to the Continuing Trust/maintenance fund, with any remaining property split equally between himself, Scott, and Evan.

135.    Skip's sale of the CLG Trust's investments complied with RSA 564-B:9-902(c), which directs trustees to consider, among several items, the need for liquidity and the "preservation or appreciation" of capital.  Skip's actions accounted for the need for liquidity and to preserve capital given the expected near-term distribution of trust property.  Because Skip's intention, consistent with the CLG Trust's terms, was to distribute the CLG Trust property in the near term, it was reasonable for him to conclude that the interests of capital preservation and liquidity outweighed the competing interests of capital appreciation and income generation.

136.    It is reasonable for trustees faced with a near-term distribution requirement to sell assets and deliver distributions in cash, and a trustee should not expose trust property expected to be

---

[59] Art. 4.11.A, CLG Trust.
[60] Art. 4.3, CLG Trust.

paid from the trust in the near term to the risks of volatile equity markets.

137.     Because Skip expected to distribute the CLG Trust's property in the near term, he acted prudently by liquidating the CLG Trust property.

138.     Skip's reinvestment of the trust property in April 2018 also did not violate his fiduciary duties to manage and invest the trust property.  Although Skip had reasonably believed in November 2017 that a distribution of the trust property was likely in the near term, on December 12, 2017, Evan sent his notice of claims against the CLG Trust property.  At that point, a distribution of the CLG Trust property was untenable given Evan's demand that the CLG Trust make no distributions pending the resolution of his claims.

139.     By April 2018, Skip reasonably (and correctly) determined that Evan's claims would not be resolved in the near term.  Accordingly, Skip's reinvestment of the trust property to take advantage of capital appreciation and income generation was prudent.  Skip's decision to reserve a portion of the property in cash to pay Evan's claims or the CLG Trust's attorney fees was also prudent.

140.     Evan quibbles with Skip's specific investment choices and lack of written investment plan.[61]  As to the selection of the mutual funds over index funds, Article 4.3 and the prudent investor rule, RSA 564-B:9-902, effectively leave the trustee of the CLG Trust large discretion in the selection of specific assets to invest.  Skip consulted with an account manager when selecting the investments.  Skip evaluated each investment option and the option of prepaying the investments' fees.  Skip determined that, if the trust or maintenance fund held these assets for a long period of time, which was the plan, it was less expensive to prepay the fees than to pay them over time.  Skip's decision-making in this regard was prudent as required under RSA 564-

---

[61] Evan Gray Proposed Rulings of Law ¶¶ 32, 36, 48.

B:9-902 and demonstrates the use of his "best judgment" per Article 4.3.  Furthermore, Skip

acted in good faith in exercising his authority as trustee to manage the trust assets.

141.    As to Skip's failure to document his investment plan and his reasons for liquidating the

assets and reinvesting them in April 2018, the law and trust terms required Skip to manage the

CLG Trust property prudently, to use his "best judgment," and to act in good faith.  Neither the

trust terms nor New Hampshire's prudent investor rule require a trustee under these

circumstances to create a written investment plan.  Likewise, under state law and the trust terms,

Skip did not have a duty to consult with Scott or Evan before making decisions about how to

manage the trust property.[62]

142.    In sum, Skip did not violate his responsibilities to manage and invest the trust property

prudently, to use his "best judgment," or to act in good faith because of his investment decisions

in November 2017 and April 2018.

### 2.        Provision of annual accounting and vacancy report.

143.    In Count 3, Evan also contends that Skip breached his fiduciary duties by failing to

properly communicate with the trust beneficiaries (Evan and Scott) and by failing to timely

provide a complete and accurate accounting of the trust property.[63]

144.    As to the provision of the vacancy report and annual accounting, Skip acted in good faith

and Evan failed to show that he or the trust suffered any harm because of any delay in receiving

---

[62] While the court agrees with Lisle that it would have been better practice for Skip to
have disclosed his intentions to the beneficiaries beforehand and documented his reasons for
undertaking it, he is not held to the standard of best practices.  See Restatement (Third) of Trusts
§ 82 cmt. d. (2003) (noting that, in some circumstances, a trustee should disclose "important
adjustments being considered in investment or other management strategies" as well as "plans
being made for distribution on termination or partial termination . . . of the trust").

[63] Evan Gray Proposed Rulings of Law ¶¶ 14, 17-18.

the reports.  Evan proved only one inaccuracy with the reports, but did not show he or the trust suffered any harm as a result of the misstatement.

145.    Under the New Hampshire Trust Code, a trustee of an irrevocable trust must provide a report "at least annually" to the trust distributees, "unless the terms of the trust provide otherwise."  RSA 564-B:8-813(d) ("Duty to Inform and Report").  CLG Trust Article 4.8 modifies this rule slightly, stating that "the trustee shall render annually an account of the trustee's administration to each of the income and residuary beneficiaries who requests it for the trust of which he or she is a beneficiary."

146.    Under the CLG Trust's terms, Skip's responsibility was to provide an annual account to a beneficiary who requested one.  Evan requested that Skip provide an annual account.  Skip provided an account to Evan.

147.    RSA 564-B:8-813(d) further states that, "[u]pon a vacancy in a trusteeship, unless a cotrustee remains in office, a report must be sent to the qualified beneficiaries who have attained 21 years of age and those who have the rights of a qualified beneficiary by the former trustee.  A personal representative, conservator, guardian of the estate, or guardian of the person may send a report on behalf of a deceased or incapacitated trustee."  Id.  This report "shall include a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee's compensation, a listing of the trust assets, and, if feasible, their respective market values."  Id.

148.    Evan requested that Skip provide a vacancy report.  Skip provided a vacancy report to Evan. [64]

149.    One item on the annual accounting was inaccurate, which was the reported cost basis for a municipal bond that had been owned by the CLG Trust.  Skip relied on McLane Middleton to prepare this aspect of the accounting.  Skip demonstrated by a preponderance of the evidence that he acted in good faith in relying on McLane Middleton or in preparing that aspect of the report.  Accordingly, per Article 4.3 of the CLG Trust, Skip "shall not be liable" for that misstatement, to the extent any breach of fiduciary duty occurred.

150.    In any event, Evan knew that this item was inaccurately listed, and he did not prove that the inaccuracy was anything more than an inconsequential misstatement.  Although Evan speculated that the CLG Trust might have overpaid its tax burden as to the sale of those municipal bonds, Evan did not provide any documentation or testimony of any person with personal knowledge of the CLG Trust's tax payments to support his speculation.

151.    Evan did not show that any other aspect of the first accounting or vacancy report was materially incorrect or deficient.  Other than the one payment for legal expenses, discussed next, Evan did not prove by a preponderance of the evidence that Skip breached any fiduciary duty by improperly paying any personal expenses out of CLG Trust property. [65]

---

[64] The parties debate the meaning of RSA 564-B:8-813(d), which defines whether a trustee must provide a vacancy report to beneficiaries.  Evan contends that the statute requires a trustee to provide a report whenever there is a vacancy in the trustee position.  Skip argues that when the vacancy occurs because of a death, the successor trustee "may"—but is not required to—send a report to the beneficiaries.  Regardless of whether the report was required, Skip did, in fact, send a vacancy report.

[65] Evan proposes that the court should reduce the amount in the Continuing Trust "by the costs of holding" the Continuing Trust's property "during the period of the First Annual Account."  Evan Gray Proposed Rulings of Law ¶¶ 66, 67; see also id. ¶¶ 49-50.  Evan did not indicate by what amount he claims the amount in the Continuing Trust (which has not been created yet, in any event) should be reduced.  Evan did not prove by a preponderance of the

152.    Evan did not establish any damages or entitlement to other relief because of the delay in providing the vacancy report or annual accounting.

153.    Evan did not establish any damages or entitlement to other relief because of any inaccuracy in the vacancy report or annual accounting.

### 3.    Payment of legal expenses from CLG Trust account.

154.    Skip paid a $170 personal legal expense from the CLG Trust property, which reduced the amount available to the CLG Trust's beneficiaries by $170.  To the extent the amount has not already been restored, Skip shall pay $170 into the CLG Trust account.  See RSA 564-B:10-1002(a)(1) (requiring trustee who commits breach of trust to "restore the value of the trust property and trust distributions to what they would have been had the breach not occurred"); In re Guardianship of Dorson, 156 N.H. 382, 386-87 (2007) ("Equity is primarily responsible for the protection of rights arising under trusts, and will provide the beneficiary with whatever remedy is necessary to protect him and recompense him for loss, in so far as this can be done without injustice to the trustee or third parties."); Restatement (Third) of Trusts § 88 cmt. a (2003) ("[I]f expenses that are improper have been paid from the trust estate, the trustee ordinarily has a duty to restore the amount of the improper payment(s) to the trust . . . ."), id. § 100(a) (stating that trustee is liable to restore value of trust property to what it would have been if the trust had been properly administered).

---

evidence that he is entitled to relief as to paragraphs 66 and 67 of his proposed rulings of law. Likewise, Evan asserted in his proposed rulings of law that Skip breached his fiduciary duties by failing to identify the personal property at the Grafton Property that he intends to retain under the CLG Trust terms and by failing to distribute what he does not intend to retain in reasonably equal parts between the three brothers.  Id. ¶ 22.  Evan did not prove any of the factual allegations underlying that claim by a preponderance of the evidence.

155.     As to any other amount, Evan did not prove by a preponderance of the evidence that Skip used CLG Trust property to pay for legal expenses not pertaining to the CLG Trust.

156.     Evan did not show by a preponderance of the evidence that Skip paid legal expenses for Chester's estate from the CLG Trust.  The CLG Trust must pay claims against Chester's probate estate to the extent Chester's estate cannot pay them.  See RSA 564-B:5-505(b).  Unpaid legal expenses are likely to become claims against Chester's estate, so the CLG Trust may have ended up paying the estate's legal bills in any event.  Further, if the payment of the estate's legal bills by the CLG Trust were to lead to a surplus in the estate, any assets that remain in Chester's estate after its debts are paid pass to the CLG Trust.  In other words, for the purposes of this issue, Chester's estate and the CLG Trust were, in essence, a single pot of money, so there was no loss to Evan or the other CLG Trust beneficiaries for any amounts paid by the CLG Trust for legal services provided to Chester's estate.

157.     Evan did not prove by a preponderance of the evidence that Skip breached any other fiduciary duty while acting as trustee of the CLG Trust.

### C.     Count 4: Skip's conduct as co-trustee of the BJG Trust

158.     In Count 4, Evan contends that Skip should be removed from his position as co-trustee of the BJG Trust due to inherent conflicts of interest; serious breaches of trust; and his failure to cooperate with Evan and Scott, which substantially impairs the administration of the trust.

159.     A trustee has a duty of loyalty, meaning that he "shall administer, invest and manage the trust and distribute the trust property solely in the interests of the beneficiaries."  RSA 564-B:8-802(a).[66]  Similarly, when a trust has two or more beneficiaries, "the trustee shall act impartially

---

[66] Evan Gray Proposed Rulings of Law ¶ 107.

in administering, investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective interests." RSA 564-B:8-803.

160.     A trustee must keep co-trustees "reasonably informed about the administration of the trust." RSA 564-B:7-703.  Specifically:

> A trustee shall keep each cotrustee . . . reasonably informed about the administration of the trust, to the extent the trustee has knowledge that the other cotrustee . . . does not have of the trustee's actions, or regarding other material information (or the availability of such information) related to the administration of the trust that would be reasonably necessary for the cotrustee . . . to perform his or her duties as a trustee . . . of the trust.[67]

161.     The court may remove a trustee if the trustee "has committed a serious breach of trust," if there is a lack of cooperation among the co-trustees that "substantially impairs the administration of the trust," or because the trustee is unfit, unwilling, or persistently fails to administer the trust effectively.  See RSA 564-B:7-706(a), (b)(1)-(3); Hodges v. Johnson, 170 N.H. 470, 487-88 (2017); Shelton, 164 N.H. at 503-504.  The court, however, should defer to the settlor's choice of trustee.  See Restatement (Third) of Trusts § 37 cmt. f (2003) ("The court will less readily remove a trustee named by the settlor than one appointed by a court."); see also Unif. Trust Code § 706 cmt. ("Because of the discretion normally granted to a trustee, the settlor's confidence in the judgment of a particular person whom the settlor selected to act as trustee is entitled to considerable weight.").

## 1.    Barbara and Chester waived any potential inherent conflict of interest by appointing Skip as trustee of both trusts.

162.     Evan contends that Skip cannot be a co-trustee because he is disqualified by conflicts of

---

[67] Evan Gray Proposed Rulings of Law ¶ 107.

interest based on Skip's responsibilities as trustee of the CLG Trust.[68]

163.    "Ordinarily, a court will not remove a trustee named by the settlor upon a ground that was known to the settlor at the time the trustee was designated, even though a court would not itself have appointed that person as trustee."  See Restatement (Third) of Trusts § 37 cmt. f, f(1) (2003).  "[T]he fact that the trustee named by the settlor is one of the beneficiaries of the trust, or would otherwise have conflicting interests, is not a sufficient ground for removing the trustee . . . ."  Id.

164.    Chester and Barbara appointed Skip to his positions as trustee of the CLG Trust and co-trustee of the BJG Trust.  Chester and Barbara were aware that Skip, as trustee of two separate trusts, may have competing fiduciary duties.  By appointing Skip as trustee of both trusts and naming him as a beneficiary of both trusts, Chester and Barbara therefore waived any potential inherent conflict of interest or duty of loyalty issue regarding such competing fiduciary duties involving the two trusts.

165.    Further, Evan did not prove by a preponderance of the evidence that Skip acted with partiality as to one or more of the BJG Trust beneficiaries nor that Skip acted disloyally to the trust property or the trust's beneficiaries.  See RSA 564-B:8-803; Restatement (Third) of Trusts § 79 & cmt. b(1) (2003) (discussing duty of impartiality); id. § 78 cmt. c(2) (addressing duty of loyalty, and stating that "the common situation in which one or more of a trust's beneficiaries are selected or authorized by the settlor to serve as trustee or co-trustee inevitably presents an array of conflicts between the trustee's interests as a beneficiary and the interests of other beneficiaries; the problems presented by these (usually) implicitly authorized conflicts are most

---

[68] See Evan Gray Proposed Rulings of Law ¶ 117.

appropriately dealt with as questions of impartiality under § 79.").

166.    Accordingly, Skip is not disqualified as trustee of the BJG Trust by virtue of an inherent

conflict of interest between his positions as co-trustee of CLG Trust and trustee of the BJG Trust.

Nor has Skip breached any aspect of his duty of loyalty or impartiality by favoring one or more

beneficiaries over the others.

### 2.     Skip did not commit any serious breach of trust.

167.    Second, Evan contends that Skip committed three serious breaches of trust that justify

removing him as a trustee of the BJG Trust: (1) he failed to notify Evan and Scott about

accepting his position as co-trustee of the BJG Trust;[69] (2) he failed to properly communicate

with his co-trustees and attempted to take unilateral control of the BJG Trust property;[70] and (3)

he failed to investigate the claims that Evan alleged against Chester on the BJG Trust's behalf.[71]

168.    The commentary to Uniform Trust Code § 706 explains the meaning of "serious" breach

of trust:

> [N]ot every breach of trust justifies removal of the trustee. The breach must be
> "serious." A serious breach of trust may consist of a single act that causes
> significant harm or involves flagrant misconduct. A serious breach of trust may also
> consist of a series of smaller breaches, none of which individually justify removal
> when considered alone, but which do so when considered together.

Unif. Trust Code § 706 cmt.; see also Restatement (Third) of Trusts § 37 cmt. e & g (2003)

("Not every breach of trust warrants removal of the trustee . . . but serious or repeated

misconduct, even unconnected with the trust itself, may justify removal.").

---

[69] Evan Gray Proposed Rulings of Law ¶ 99.
[70] Evan Gray Proposed Rulings of Law ¶ 108
[71] Evan Gray Proposed Rulings of Law ¶ 115.

169.    Skip did not commit any serious breach of trust as co-trustee of the BJG Trust.

170.    Evan and Scott understood that Skip was acting as a co-trustee of the BJG Trust.  Skip did not commit a serious breach of trust by failing to explicitly inform Evan or Scott that he had accepted the office of trustee when this information was known to Evan and Scott.

171.    Evan did not prove by a preponderance of the evidence that Skip attempted or desired to take "unilateral control" of the BJG Trust property.  Rather, Skip intended to distribute the BJG Trust property consistent with the BJG Trust's terms, including ensuring that the pour-over provision, Article 2.4.A, was followed if necessary.

172.    Skip did not commit a serious breach of trust by sending and then rescinding the letter instructing Merrill Lynch to distribute the BJG Trust property.  The delay in sending the letter was also not a serious breach of trust.

173.    Skip reasonably understood his rescission letter to be in service of a trust beneficiary, namely, the Continuing Trust or maintenance fund.  After Evan sent his notice of claims in December 2017, it was reasonable and prudent for Skip to become concerned that the BJG Trust might need to give property to the maintenance fund if Evan prevailed on his claims against the CLG Trust.  Consistent with that concern, Skip (through counsel) sent a letter to Scott and Evan requesting that they refrain from distributing the BJG Trust property.  By rescinding the instruction to distribute the BJG Trust property, Skip acted prudently in attempting to protect the maintenance fund's interests.

174.    Skip's payment of the BJG Trust tax bill and retention of an accountant to aid payment of the BJG Trust tax bill were not serious breaches of trust.  Skip should have discussed the matter with his co-trustees before paying the bill.  See RSA 564-B:7-703(i).  Nonetheless, the payment of the BJG Trust's tax liabilities by Skip was in service of maintaining and preserving the trust

property.  Further, Skip did not use BJG Trust property without Evan or Scott's consent to pay the accountant or pay the tax bill.

175.    Evan failed to prove by a preponderance of the evidence that Skip insufficiently investigated the claims that Evan made against the CLG Trust on behalf of the BJG Trust. Evan's claim in this regard was founded on his speculation and conjecture.

### 3. There is a lack of cooperation among the trustees, but it does not substantially impair the administration of the trust and removing Skip would not improve the trust's administration.

176.    Third, Evan contends removing Skip is warranted because he has failed to cooperate with Evan and Scott, which substantially impairs the administration of the trust.  Evan asserts that removing Skip is the only way to facilitate the proper management of the trust property.[72]

177.    Skip, Scott, and Evan had--and continue to have--difficulty communicating and cooperating even on basic matters.  Despite the legal battles over the trust's management, most of the acts that remain to be performed by the BJG Trust trustees are ministerial.  Specifically, once Evan's lawsuits are resolved, the only thing the trustees must do is distribute the BJG Trust property to any creditors, the Continuing Trust/maintenance fund (as necessary), and the three remainder beneficiaries (themselves).  See Art. 2.4.A, B, BJG Trust.  After those acts are performed, the BJG Trust will cease to exist.  See id., Art. 3.7.  Since these acts leading to the termination of the BJG Trust require no exercise of judgment, there is no reason to remove Skip as trustee on the basis that doing so will remove an impediment to the trust's administration.  See Bogert's The Law of Trusts & Trustees § 527 (June 2022 update) (noting that if trustee duties are "merely ministerial or formal" removal of trustee because of hostility will be denied); cf.

---

[72] Evan Gray Proposed Rulings of Law ¶ 117.

Restatement (Third) of Trusts § 37 cmt. e(1) (2003) ("Friction between the trustee and some of the beneficiaries is not a sufficient ground for removing the trustee unless it interferes with the proper administration of the trust.").

178.    Further, removing Skip would not remove any impediment to properly managing the BJG Trust property because the administration is affected by Evan's actions, not Skip's management. The BJG Trust property remains uninvested because of Evan and Scott's refusal to acquiesce to Merrill Lynch's terms for managing the account, not because of any action or inaction by Skip. Accordingly, the court declines to remove Skip on the ground that he prevents the BJG Trust property from being invested.

179.    Further, it concerns the court that Evan's actions have elevated his personal beliefs about the need and purpose of the maintenance fund above the settlors' intent to create a maintenance fund, as stated in the trust instruments.  Evan demonstrated during trial that he is a skilled and professional lawyer.  But his better judgment has been overwhelmed by his disdain for Chester's plan, and his deep-seated mistrust and personal animosity--warranted or not--toward Skip. Simple issues have grown to unwarranted proportions because of Evan's tendency to assume that Skip is operating with malicious intent.  Furthermore, even if Evan were correct about Skip's behavior, an experienced lawyer like Evan should understand that the emotional undercurrent of this case undermines his judgment both as legal counsel and a trustee, as it would any other person in the same circumstance.

180.    It would not be in the interest of justice to remove Skip as co-trustee.

181.    In sum, Evan has not shown by a preponderance of the evidence that he is entitled to the relief he seeks as to Count 4.  Accordingly, judgment will be entered in Skip's favor as to Count 4.

## III.     Conclusion

The court directs Skip Gray to reimburse the CLG Trust $170 for the payment of personal legal expenses with trust property.  Judgment is otherwise in Skip Gray's favor as to Counts 3 and 4.  The clerk shall enter judgment accordingly.

The court adopts the parties' findings of fact and conclusions of law to the extent they are consistent with the court's own findings of fact and conclusions of law.  The parties' proposed findings of fact and conclusions of law are otherwise denied.  The court also denies Evan's motion to strike (doc. no. 234) Skip Gray's good faith affirmative defense.

As the prevailing party, Skip Gray is entitled to costs should he choose to seek them.  See 28 U.S.C. § 1920, Fed. R. Civ. P. 54(d)(1); LR 54.1(a).  The court finds that Skip Gray is the prevailing party because he has prevailed as to the substantial part of this litigation.  That is, Skip prevailed on the merits as to his declaratory judgment counterclaim and as to the substantial portions of Counts 3 and 4, finding himself liable for only a nominal sum for a non-serious and de minimis breach of trust.  Accordingly, if Skip wishes to seek costs, he shall file a bill of costs as directed under Local Rule 54.1.

The matter of attorney fees and/or reimbursement remains for adjudication, as set out in Skip Gray's counterclaims and in his pretrial statement.  See doc. nos. 204 (Skip CLG Trust pretrial statement); 206 (Skip BJG Trust pretrial statement).  The court previously denied a motion by Evan to dismiss Skip's counterclaims, which effectively claim attorney fees, for lack of jurisdiction.  See Order of April 1, 2022.  Evan appealed that ruling to the Court of Appeals on April 29.  That appeal remains pending as of the date of this Order, and the appeal divests the court of jurisdiction to further address Skip's counterclaims.  E.g., Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of

jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district

court of its control over those aspects of the case involved in the appeal.").  Accordingly, the 14-

day time period to file a motion for attorney fees is stayed pending resolution of that appeal.  See

Fed. R. Civ. P. 54(d)(2) (stating that party seeking attorney fees must file a motion "no later than

4 days after the entry of judgment" unless "a statute or court order provides otherwise").

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 4, 2023

cc:      Evan W. Gray, pro se
         Benjamin T. Siracusa Hillman, Esq.
         Roy S. McCandless, Esq.
         Timothy John McLaughlin, Esq.